Chancellor DbSaussure,
I concur with Chancellor Johnston.
Richardson, J.
The primary question presented by this case, is allied to the one so often moated, to wit: Whether the commissioners of public roads have the' constitutional authority to take private lands for public roads. But the immediate question is ; Have they the right to select timber trees for the repairs of the roads, without compensation to the owners? By the general road Act of 178S* P. L. 445, the commissioners are authorized to lay oüt and make ro"ads ; and in order to keep them in repair, may take the tre'es in or near the roads. But by the Act of 1817, the power of making roads is taken from the commissioners, leaving them only the authority to repair, as it stood under the Act of 1788, and to take trees in or near t'he roads, for that purpose. Before the repealing Act of 1817, the right of the commissioners to make public roads, is supposed, in some recent cases, to have been judicially established by the decision of the Constitutional Court, in the case of Lindsay and others vs. The Commissioners of East Bay-street, 2 Bay, 38. And we find such doctrine recently recognized in the case of Manigault and others vs. Commissioners of Cross Roads, 4 M’Cord, 541. But it cannot escape observation, that in both those cases, the commissioners acted as the mere executive agents of the Legislature, under Acts passed for the puipose of opening particular named streets.
*107 It is one thing, and maybe constitutional for the Legislature, to have opened specific roads — (which is what was accustomed to be done in our earliest civil history) — but quite a different question arises, when the Legislature attempts to delegate to any tribunal whatever, a general power to open roads at discretion, and to keep them in repair, by taking trees as offen as deemed necessary, without compensation. It is this transfer of power, which now makes the proper question before the court, and the incident of taking remote trees, is complained of. And here, let me remark, that it will be found upon investigation, that such a transmission of the Legislative power commenced no sooner than about the year 1721; and that the general power to take trees to repair roads began with the Act of 178S. Before 1788, the power was confined to bridges ; and was even then very qualified in extent; so that the truth is, that neither the one nor the other has been sanctioned by an antiquity coeval with our civil history, as has been often supposed, in argument, at different times.
Such is the view under which, it appears to me, that the questions now made are still open. And I enter upon the discussion with arguments that occurred to me, dimly, at the time of hearing the case; but which I then thought worthy of public consideration ; and which, after some investigation of the general doctrine, and the examination of all our reported cases, have left a strong conviction, that the case of Lindsay, while in itself it decided no doctrine whatever, yet left a false gloss, which has unduly beset other successive cases ; and may lead to errors which ought to be arrested.
The power of using private property for public purposes, called the eminent domain, is permitted only for the public safety and general convenience. Such a high prerogative, which arises from the necessities of government, belongs only to that tribunal which exercises, practically, the sovereign power of the whole civil society, and should be restricted to it alone, and never confided to other hands. I need scarcely remark, that it is the greatest power, coupled with the highest trust, and delegated to the immediate representatives of the people, in the confidence that they will not abuse their eminent domain ; and therefore, it may not be delegated to any inferior tribunal. I will not quote a mere maxim, upon such a subject, The rationale strikes every understanding, and holds correspondence with the best interests of us all. To confide in a given trustee, is not confiding in all his agents. But such a distinction could not find a place in Lindsay’s case, or Manigault’s.
The Acts of the Legislature, before the court, in those cases, were specific. The one, to join East Bay-street to South Bay. The other, to *108 connect America-street with Judith-street. In both, the commissioner? of streets were ministerial agents, each for a named instance only ; and ¡were not endowed with general power to lay out roads, at discretion. And, accordingly, those cases can decide no more, than that the Legislature itspjf, may, by a specific Act, appropriate the lands of an individual citizen, fora public road, without compensation.
In such cases, the Legislature itself exercises the eminenp domain, and transfers the usp of the freehold.to the public; no other tribunal is put in the plgce of the Legislature, and the commissioners are executive survey-, ors only. Tajte, for example, the great historical instances.
Whep the Isle of Man was annexed to Great Britain ; when the terrij tory of seven of phe Lords Proprietors of the Carolinas was transferred to the crown ; these were done by Acts of Parliament. TJnder our own goyepnments, — when Indiana lands are annexed to the States, or to the federal territory, it is done by the Legislatures.
A familiar example may be found, whenever vye erect a court-house in a new district. In all such instances, it is the Legislature, itself, that divests priyate property for public purposes, whatever agents may be em: ployed to see the actual transfer made.
But let us lopk further into our own adjudged cases. In the case of M’Gowen vs. Starke, 1 Nott & M’Cord, 387, the Act of 1811 specifically erects a named public ferry, and of course, the question of delegating the eminent domain could not arise.
In the case cf Ford vs. Whitaker, 1 Nott & M’Cord, p. 5, the plaintiff’s counsel concedes the doctrine, as if settled by Lindsay^s case, and other cases; whereas, in Lindsay’s case, thp judges were equally divided. In Ford’s case, the true poipt might have been made, but yvas not submitted to the court, yjfe are referred in this case, also to Wiphers’s and Singleton’s cases fop the decision. Withers’s case is not reported; but, as far as I can recollect the pase, it necessarily decided no more than that the commissioners may open and repair an old road; ahd in Singleton’s easp, see 2 Nott & M-’Cord, £¡26, the only points decided, are, that the wqrd .“ public,’-’ in old Acts, is synonymous with “ roads;” and that the cuna-; missioners have no power to lay out roads for individuals. And a hope is expressed, that the uncertain case of Withers will be found to respect the constitution and magna charta.
’VV'here, then, I ask, has it even been decided, that the commissioners qf roads ever held the eminent domain, and could appropriate private lands without compensation; unless I am mistaken in the unreported case of Withers 1 And I repeat, that of all the cases, so far reported, that of Ford vs. Whitaker is the only one in which both the general doctrine and *109 the true distinction, could have arisen ; and in it, the former -was conceded as a settled point; the latter never was adverted to.
Conceding, then, the general doctrine, that'the Legislature may exercise the eminent domain as a constitutional power; yet the counsel, throughout all the cases, have, in no one instance, taken the true distinction between the Legislature exercising their lofty trust in a specific instance, and delegating their sovereign power to secondary hands. And, assuredly, we are not to shun the exact question, which Dawson’s case fairly presents. The vast privilege of the eminent domain is, in my judgment, the last power that can be transferred. The Legislature may just as well delegate their general power of passing and repealing laws.
There is, however, one other decision, bearing upon the true question before us, which must be noticed. I mean the case of Eaves vs. Terry. 4 Nott & M’Cord, p. 125.
In this case, we find, as usual, Lindsay’s case, McGowen’s, Singleton’s, and Withers’s cases, adduced to shew the doctrine settled ; and, of course, the same inconclusiveness, in the proofs of the predicate of the argument, is apparent. In terms, we meet with an instance, in this case, of the eminent domain being judicially allowed to the commissioners of roads, in the license to take adjoining timber trees to repair the roads. But, over and above the mistake in assuming that former adjudications had established the doctrine in favor of the commissioners of the roads, it is .clear that the distinction between the Legislature exercising their trust, and the transmission of it to inferior hands, was not insisted on in the argument, nor adverted to in the decision.
And whenever adjudications are clearly referable to an oversight, omission, or concession of the main question, they decide the particular case only ; but do not make doctrine for subsequent cases, to which neithér the same oversight, omission, nor concession, belongs.
After an examination, therefore, of all the adjudged cases, I can, in no way, admit it to have been settled by any case, that the commissioners of roads ever had the constitutional authority to appropriate private lands for roads, or to take trees, without compensation. While, at the same time, I do admit, that the Legislature may have such a power, holding, as they do, the practical sovereignty, in this respect, from time coeval with our civil history. That thus much has been fully adjudged, cannot be denied. But, I equally hold it, and must maintain, that it is one of those eminent powers, coupled with a trust and confidence that cannot be constitutionally delegated to any other hands; although executive agents may he appointed to enforce practically the eminent domain of government, under a spepjal Act, which enacts the particular instance ; orders the specific streets *110 or roads to be marked out, by ministerial agents. For myself, then, I do not feel that the court is fettered, in the case now before us, by any former decisions, when fairly understood; while it is plain, that the current of opinions have set one way, ever since Lindsay’s case in 1795. But that is not enough, if the true constitutional doctrine should be found leading to a different conclusion.
The authoi'ity to use private property for public purposes, without compensation, if permitted at all, can be exercised even by the sovereign power of government, only in those cases where the common safety or convenience demands the sacrifice of individual interest for a great general public good.
Is there any such authority in any branch of government? is now the question ; and if the negative can be shewn, I trust we shall ponder long, before we proceed to step farther than the decision in Manigault’s case; and say, that the Legislature not only have the authority, but mky delegate a part of it to the commissioners of the roads.
Sir William Blackstone, the most authoritative commentator upon the principles of English constitutional law, gives us the doctrine in these words : “ So great is the regard of the law for private property, that it will not authorize the least violation of it; no, not eveñ for the general good of the whole community.” “ If a new road were to be made through the grounds of a private person,” &c. &c. “ the law permits no man, or any set of men, to do this, without the consent of the owner of the land,” &c. &c. “ In this, and similar cases, the Legislature alone can, and indeed frequently does interpose, and compel the individual to acquiesce.” “ But how?” “Not by stripping the subject of his property, in an arbitrary manner.” “ But by giving him full indemnification and equivalent for the injury sustained.” 1 Black, p. 139. If we look into the English highway Acts, we find the principle of full compensation held sacied. See 13 Geo. 3, ch. 78.
This is the English rule; and I may add, that in their practical political economy, that nation adheres to the same rule, in a constant regard for vested rights, however originally obtained. We had lately a striking instance in their West India Act of abolition — while the ministry yielded -to the great national cry for the Act, they still required compensation as :the condition; and the constitutional law of the land was held inviolable.
Butl let us turn to the great American commentators, upon the subject ,of the eminent domain. They are, Rawle, Kent and Story. And with ,one accord, they put the same construction upon the venerable jurists of jEurope, that Judge Waties did in the case of Lindsay.
^Chancellor Kent sunjs up the doctrine upon the subject, atjd concludes *111 as follows: — “A provision for compensation is a necessary attendant on the due and constitutional exercise of the power of the lawgiver to deprive an individual of his property, without his consent.” “ And this principle in American jurisprudence, is founded in natural equity ; and is laid down by jurists, as an acknowledged principle of universal law.” 2 Kent’s Com. 275. Chancellor Kent, having stated the universal principle, as laid down by Grotius de Jure, B. & P. b. 3. c. 19, s. 7. c. 2. s. 7. Puff, de Jure Nat. et Gent. b. 8. c. 5. 13 and 7. Bynk. 2. J. Pub. b. 2. c. 15. Vattel, b. 1. ch. 20, p. 244 — and which, by the by, are the very authorities quoted by the counsel against Lindsay’s motion'; and which Judge Waties then said, (as is now fully argued by Kent,) well supported Lindsay’s motion for a prohibition — goes on and adds “ It would be a violation of contract, and repugnant to the constitution of the United States, to interfere with private property, except under the limitations which have been mentioned.” 2 Kent, 276.
Judge Story, commenting Upon the 5th article (amendments) of the United States constitution, that private property shall not be taken for public use, Without just compensation, says — “ This is an affirmance of a great doctrine, established by the common law, for the protection of private property. It is founded in natural equity; and is laid down by jurists as a principle of universal law.” 3 Story’s Com. p. 661. And he' adds to the other great writers, Wilson, 3d voL 303 ; and Tucker, (Appendix,) 305 — 306—and the Cases specially adjudged on the subject. 3 Dallas, 194,235. 1 Peters’s Cond. R. 99, 111. 1 Black. 138-9 and 140.-2 Dali. 384.
Counsellor Rawle, (p. 12S,) commenting upon the 5th article of the' amendments to the constitution of the United States, says — “ It follows, from all the antecedent precautions,” (the precautions of the 5th article,) “ that no one can be deprived of life, liberty or property, without due process of law; and the repetition is only valuable, as it exhibits the summary of the whole ; and the anxiety, that it should never be forgotten.” Proceeding to the last clause of the same article, he says — “ In some countries, &o. &c. the Sovereign makes use of it, (private property) without ceremony. In others, it cannot be taken from the individual on any terms, without his own consent. A middle line is the proper course,” &c. &c. “ The people, by declaring that ‘ private property shall not be taken for public use, without just compensation,’ have agreed, that, in such cases, and on such terms, it may be taken.” So much for the American commentators. They are jurists worthy our profound attention.
Here, let me take occasion to meet a difficulty, which, even at this day, we find raised, in judicial opinions too, upon the terms of our State conj *112 stitution, (9th article, sec. 2,) &c. “ by the- law of the la'nd,” (which is a literal translation of the ‘per legem terree'’ of magná charta.) The doubt seems to be, (see Manigault’s case,) whether those terms may not still mean an Act of the Legislature; and not the due process of the common law “ of Lord Coke and Dr. Sullivan.” But, when we find the same exposition adopted, without exception, by all succeeding commentators, American and English, Cave’s Eng. Lib. p. IS — Tucker’s app. 304-5— Kent, 2 vol. p. 10 — Story, and ’JKawle. . And when, to these authorities, we add the practical fact, that in the 5th and 6th articles of amendments of the United States constitution, we have adopted the very expositions, exceptions, and understandings, laid down by Coke and Sullivan, and embodied them in plain modern English words — who, I ask, can reasonably continue to doubt, that the “legem terra” of magnav charta — “the law of the land” of our own State constitution; and “the due process of law * of the United States constitution, are precise synonymes; with their true sense and proper understanding, cautiously set forth in the federal constitution %
Upon this perfect amity between our constitutions, and the source of both, as expounded by the’ best commentators, permit me to offer one authority, which, 1 think, must settle the meaning of “ lex terra.” “ The right of personal security, (says Chancellor Kent, 2 vol. p. 9,) is guaranteed by provisions which have been transcribed into the constitutions from magna charta, and other fundamental Acts of the British Parliament,” &c. He then details the provisions of the 5th and 6th articles for personal security. And proceeds — The constitution of the United States, and the constitutions of almost every State, contain the same declarations, in substance,” &c. and they must be regarded as fundamental doctrines in every State, &c. &c. “ It may be received,” (be continues,) as a self-evident proposition, universally understood,” &c. “ that no person can be taken,” &c. “ or disseised of his freehold, or liberties, or estate,” &c. “ or deprived of life, liberty, or property, unless by the law of the land, or the judgment of his peers.” “ The words, by the law of the land, fee. are understood to mean, due process of law, that is, by indictment, or presentment of good and lawful men.” 2 Inst. 50. The words, "per legem terra,h “by the law of the land,” and “due process of law,” have, then, one fixed meaning, well expounded, recognized, and adopted throughout the United States.-
In what book', then, of good authority, it can be found written that even the Legislature can disseise the freeholder, without adequate compensation, I know not, except in some of our own recent decisions. These, I grant, are to be respected as far as they go. But decided cases *113 serve for tbe illustration of principles, and are binding in after cases, precisely similar, and no other. In no instance whatever does the law maxim, “ when the reason ceases, the law ceases,” apply with greater force than in the application of adjudged cases. Concessions, oversights, or acquiescences, depend upon the parties to a suit. These may lead to a peculiar adjudication ; and form precedents for similar cases only. Were it otherwise, a litigant, by omitting a point, or acquiescing in an inference, in some trifling case, might change or modify a principle of law, or purpose, to suit a case of greater interest to himself.
• Take, for example, a case like the one before us. One commissioner sues the rest for taking his trees. The plaintiff denies the Legislative power of taking private property, without compensation. But he acquiesces in the inference, that if the Legislature have the power, they had the right to transfer it to the commissioners of roads. (This is Eaves’s case.) Afterwards, a stranger sues the former plaintiff and his brethren, for a similar trespass. The facts are exactly the same. But can there be a doubt, that in this second action, the plaintiff may make a new question, by denying the inference, before acquiesced in; and contending, that although the Legislature hold the supposed power, yet, that like other trustees, they cannot transmit their high trust to tbe commissioners of the roads 1 This is the plain distinction between Eaves’s case and Dawson’s. In Eaves’s case, the inference was, “ in posse,” only; but here, it is “ in esse.”
And shall we, when we can thus arrest the evil which sits upon the country, like an incubus 1 shall we extend the former case, in order to make it cover the presentí I answer, emphatically, No ! We should rather incline to limit the momentum of such cases to its minimum; not raise it to the maximum.
At all events, I must take the cases as I find them; and understand them in the sense of their true and necessary decision only. And, as the principles are unerring, I will not despair of their success, finally.
The legislature not unfrequently repeal unconstitutional Acts, as inexpedient, when judges cease to offer any opposition. And thus, the constitution eventually prevails from the very inconvenience attendant upon a departure from its principles.
Upon the very point before us, after the opposition in Lindsay’s, Withers’, Singleton’s, and McGro wen’s cases, had ceased, the legislature thought proper to act; and most wisely took away the very, unconstitutional power of the commissioners of roads, in the main article complained of.
It was but the other day, that the constitutional rights and duties of the circuit judges, to meet and decide points of law, were suspended by *114 an Act of the Legislature, erecting a separate Court of Appeals. Yet here we are again ; and the constitution once more respected, in the allowance of our duties in this court. And, for myself, I cannot but trust, whatever may be the personal inconvenience, that this legislative acknowledgement of the true constitutional system, will be found salutary, when it shall have been better digested, and a little improved in its details.
With such experience before us, I do not despair of the time when Lindsay’s case sh'all be allowed to have exhibited nothing but learned arguments ; and when all the other cases which have followed in its course, will be found to have vested no abiding eminent domain in any tribunal; at feast out of th.e legislature.
It is not difficult to discover reasons for the successful impression left by Lindsay’s case. It was the first instance of opposition to the, opening of roads in South Carolina; and it was most unfortunate in its characteristics. East Bay was to be extended through open marsh lands, where the tide flowed every twelve hours ; and the new street was obviously destined to add value to the adjoining lots ; accordingly, people took part against the motion, as unjust, and wanting ordinary comity among citizens of the same town.
The city, too, employed the Telamonian Ajax of the day ; and he held his broad shield over the city claims for extension, and put his strong hand over the pages of Bynkershock and Vattel : and only lifted up a finger, where the eminent domain was laid down broadly, and without qualification ; but managed to keep the whole palm upon those pages, from which every commentator upon our constitutions, without one exception, have drawn the conclusion, that private property cannot be taken for public uses, unless upon full compensation to the ownei.
Let me here add, that in the very case, (Manigault’s,) in which it is, at last, plainly decided that the legislature may order a street to be laid out without compensation, the court say, “ Id is true, &c. that the elementary articles, as well as the people, in the Constitution of the United States, have said that private property ought not to be taken for public purposes, unless compensation be made. And so say we all, and so have said the legislature on many occasions ; and no doubt will so act, whenever a proper occasion is presented.” Now, I ask, when the constitution, and the people, and all of us say so, which constitutes an argument lull to overflowing, wherefore is it that we ract not up to such well known doctrine, .constitutional provisions, and common sentiments 1
As I take it, it was in this .very spirit of accommodating principles to the feelings of the particular occasion, that Lindsay’s case, which decided nothi.ng, has yet gro.wn up to a foundation decision — and is brought up *115 in a circle of similar cases, to prove the main doctrine — which we must first take fo'r granted before we can say that the case has decided the point in controversy. And thus, “ toties quo ties,” the case and the hypothesis; very conveniently prove each other.
At the original argument, in 1795, the judicious perception of Judge" Waties looked through the mists gathered around the East Bay case,— read Yattel, Bynkershoek, and the rest, as Rawle, Kent, and Story have since read them — and presented an argument, learned, without ostentation, firm, without offence, and, in my judgment, strong enough to carry conviction home to any mind, not biased by the particular occasion.' As his opinion stands first in order of time, so is it, in my judgment, first in lucid exposition of our then new constitution.
Before leaving this branch of the case, I must be allowed to notice one argument so often drawn from the history of our civil government. This argument assumes, that commissioners of roads had, from the earliest times»' power to lay out roads, without compensation, and to repair them, by ta* king trees near at hand. Whereas, the fact is, that the legislature specifically ordered all public roads up to the year 1721. P. L. 111. In that year the first general road Act was passed; and the commissioners were authorized to lay out roads at the equal expense of all the male inhabitants of their respective divisions ; and so sáy the court, expressly, in the case of Shoolbread v. The Corporation, 2 Bay, 63.
It is true, it so happened that no man ever required compensation before Lindsay’s case in 1795.
By the Act of 1723, (P. L. 121,) it is enacted, that future bridges, not roads, may be built and repaired, “with the most convenient adjoining timber.” And it was not until 1788, that for the first time, the eminent domain of taking land for roads, without compensation, and repairing them with trees, “ in or near” the roads, was given to the commissioners of roads, (P. L. 444.) We are not thé’n to confound the principle of law, that compensation might be required, with the practice of requiring none. In the “ olden time,” nobo'dy asked for compensation, because every one was glad to have a road run througjh his particular lands. Accommodation in practice is one thing, and the right to compensation another.
The same thing happened to the Santee Canal Company — and nearly the same to our present Rail Road. Yet, compensation might have been inquired by individuals, at every step of either the one or the other of those great highways.
I will conclude this doctrinal branch of the case against Dawson, with observing, that if any lawyer will read Lord Coke’s Exposition of the *116 29th chapter of magna charta on the words “ nisi per legale judicium parium suorum, vel per legem, terree,” (2d Institutes, p. 45,) or Dr. Sullivan’s Lecture on the same subject, (2 vol. 241,) he will have all the English doctrine as admitted by the best writers — undenied by any commentator since the day of the final confirmation of the great charter. And if he will then read the 4th, 5th, 6th, and 7th articles of amendments to our federal constitution, he will find the same exposition adopted and incorporated by the whole United States, in plain, enlarged terms. And he will find from these conclusive authorities, that the ‘‘per legem terree” of magna charta, “ the due process of law” of the federal constitution, and “ law of the land,” of our State constitution, all mean the same thing; and if he does not come to the further conclusion, and as readily, that under neither instrument can private property be taken for public use, without just compensation ; and that this is a part of the exposition of magna char-ta, expressly adopted by ourselves — I am in great error. If, after such examination and comparison, he will go farther back, and read Vattel, Bynkershock, and the other expounders of the rights and powers of government upon the subject, he will find that those eminent jurists support the same sacred rule of adequate compensation for private property when taken for public uses.
And finally, if he will consult his own understanding upon the rationale of the eminent domain, he will find that although the necessities of government and the safety of the whole people frequently require the exercise of that power, yet no necessity nor safety can require the denial or omission of adequate compensation; but that such compensation alone justifies the power, and makes it a goverme'ntal right. The emergency may excuse the taking; but it is the adequate compensation alone that brings it within constitutional principle. And I will add, such is the true and only meaning of all the venerable authorities upon the subject, which come within my reach. And as to those which I have been unable to consult, personally, I have trusted to the concurring expositions of Judges Waties, Story, and Wilson — of Chancellor Kent, Counsellor Rawle, and Sir William Blackstone, without meeting with a single commentator who does not unite with them in ascribing the same meaning to those authori ties. One would suppose that the concurrence of such witnesses would render the truth manifest, that it had lain hid for ages at the bottom of the deepest well. But it is not hidden — we have only to open our eyes — and .the true doctrine enters the understanding, in the plain English words of the federal constitution, &c. “ Nor shall private property be taken for public use, but upon just compensation.” And the same doctrine is as perfectly expressed in the words of o.ur State constitution-- — j‘ No freeman/' *117 &c. “ shall be deprived of his property but by the judgment of his peers, or by the law of the land.” These two prohibitions are identical and universal. The former is the true interpretation in modern language — the latter, the literal translation of the 29th chapter of magna charta. But there is still another aigument often resorted to, which should not pass unnoticed — -although, perhaps, it is really no more than a modification of one already considered.
It is assumed, that there has been a long acquiesence in the great powers of the commissioners of the roads, which should introduce an exception, by common consent. But, I ask, where can such an assumption be justified 1
In no more than seven years after the highway Act of 1788-conferred such powers, and only five years after our Federal and State constitutions had recognized private rights on the subject, Lindsay’s case is recorded in our earliest reporter. And from that time, Ford’s ca$e — M’Gowen’s— "Withers’s — Singleton’s-—Eaves’s—and Manigault’s cases follow, in aregulai and unbroken series, down to the one before the court. And I would add — where is the lawyer of standing and experience, who has not been engaged in professional contestation upon this subject, in some case, reported or unreported 1 ,
And yet, the same argument is brought up, in pertinacious iteration, from its first use, in Lindsay’s case, to the present; as one sanctioned by fashion; and, as though it constituted the “response sans replique;” while the very cases in which this fashion is followed, prove, at every step, that the whole argument rests upon the tottering basis of an inveterate “Petitio principii.” Common practice, in order to make a common law custom, must have the reasonable support of common consent. But here, the consent, which is the condition precedent to the lawful maturity of the custom, is to be chiefly made out through issues of opposition to the same custom. Can such a conclusion, from such premises, be a just and rational deduction 1 Upon a controversy which has divided the opinions of the court for more than forty-five years, as I would be impressive, so would I seek to be grave and deferential, even in combating what I deem mere assumption ; and which, I fear, has been so long leading to infractions of a fundamental law of the land. And 1 appeal for my facts to the reports of our various appellate courts, for thus strongly insisting, that the imposing argument, drawn from a supposed acquiesence in the power of the commissioners of the roads, has no more of a legitimate foundation, than spurious coin has of sterling metal. And it is high time that it should, in like manner, be nailed to the counter. Upon this head, 1 have heard it surmised, that some of the old royal grants reserved the *118 right to make public roads. But I have never met with one that went farther than white pines, and gold and silver mines, and lead, for the king. And such franchises have been abolished, and have no law to rest upon.
But, having taken up too much time, I have done with this argument. And Ido so, with the hope that an apology will be found in the necessity which seems to point out such a course as a duty. My confidence is, that right sentiments are growing up, and will effect a reform. And that, finally, they will settle down into one of those fixed public opinions, which represses even law', by its moral authority, and becomes itself paramount.
Leaving the constitutional branch of the case, upon which I have thought it right to express opinions of no very recent standing with myself, and admitting, for the argument sake, that the views heretofore presented may be erroneous, I shall contend :
1. That under the strict, legal construction of the general road Act of 1788, the pine timber of the defendant ought not to have been taken by the commrssioners, without compensation.
- 2. That admitting the commissioners might exercise a discretion, and take either the pine or oak timber, yet, that Dawson ought not to have been found guilty of a misdemeanor.
The first question is : Are the commissioners bound to take the nearest pine timber, or may they pass by it, in order to obtain other timber, at their discretion, although forbidden by the owner, unless upon compensation ?
The power of the commissioners is given by the 9th section of the Act of 1788, P. L. 445, to amend'the Act of 1785, P. L. 389, in the following words : “The said commissioners shall have power to cut down aud make' use of any timber, wood, earth, or stone, in or near the said high roads, &c. for the purpose of making or repairing the same, as to them shall seem necessary.” The words are broad. But when new powers are given to any body corporate, or other inferior tribunal, the grant is to be construed strictly; and no power is to be allowed, unless warranted by the letter, or the necessary intent.
In order to come at the clear intent *of the Act of 1788, let us fevert to: the early Act of 1721. P. L. 111. By it, roads and bridges are' required to be made, and kept in repair, at the equal charge and labour of all the" mala inhabitants.
In 1721, the true reading of magna charta was respected. The Act of 1723, P. L. 121, refers to the great grievance to persons living near bridges, from the destruction of their timber, (referring, no doubt, to a practice' that had crept in,) but authorizes the commissioners “to take any conve *119 nient timber” for repairing bridges, already built or to be built, under existing laws, “paying such reasonable price for the same, as they think fit;” and directs “all other bridges to be built and repaired, with the most convenient adjoining timber, without paying for the same.” Here, then, in 1723, we find the first step in the new doctrine. But again, by the Act of 1785, P. L. 389, the commissioners are expressly authorized to build and keep in repair all bridges, by an assessment upon the male inhabitants, from 16 to 50 years of age, which reinstates the true doctrine in 1785. But, over and above such important historical facts, we have, ia the Act of 1723, a clue to the meaning of the sweeping words of the Act of 1788. If “any convenient timber” be taken, it is to be paid for. If the most convenient adjoining timber is to be taken, it is not to be paid for.And by the Act of 1785, bridges are to be built and repaired at the joint expense. But the Act of 1788, gives the commissioners power to take timber for both roads and bridges, “in or near” the roads, without a word about compensation.
This is the Act we have to expound. But it is under all these Acts made in pari materia, all general Acts, and constituting our highway system, that the immediate question arises, — What do the words, “in or near” the roads import? Do they mean the “any convenient timber,” of the Act of 1723, or “the most convenient adjoining timber,” of the same Act ? That Act makes the distinction ; and unless the Act of 1788 keep it up, we virtually repeal the former, and reintroduce the very grievance -which is remedied by the Act of 1723, by paying for “any convenient timber,” but not for “the most convenient adjoining timber.” And, unless, the words, “in or near,” can be made to preserve this distinction, then it is evident that the phraseology, (“in or near” the roads,) means the nearest timber, only; and no other can be taken, by authority of the Act of 1788, It begins with timber “in” (the roads ;) the word “near,” follows ; and seems, to my understanding, to import timber next to that which is in the road; or, in the language of the Act of 1723, “the most convenient adjoining timber.” After such an index to what is meant, are we at liberty to give the words, ‘‘in or near,” any other meaning?, Or, if we do, must we not, then, keep up the distinction, as to what class of timber is to be paid for, and what may be taken without compensation, so as to preserve the system and connection of the road laws? But, laying aside this illustration of the meaning of the words, “in or near;” and supposing them of uncertain import, I ask again, are we to strain to extend the powers of the commissioners; or to restrict them, when we can; and while we yet support their authority, but in subserviency %p the established rule, that *120 forbids implied powers to be extended to such a tribunal, in derogation of common rights 1
The answer is given in Lord Mansfield’s laconic expression, in the case of Blachfryer's Bridge, 1 Cowp. 29, “why,’this is a special authority.”
For my own part, whether we take the argument from the letter of the Act, (“in or near,”) from its body and spirit, as indicated by the distinction laid down in the Act of 1723, or reason, “ab inconvenienli,” I can put but one strict construction upon the powers of the commissioners. They are to take none but the nearest timber, if objected to by the owner; unless upon compensation.
Under any other construction, the impositions might be enormous. If they could pass the oak timber, “because it warps in the sun,” they might pass the pine, and go on to Dawson’s cypress timber, because it is wrought more easily ; and from the cypress to a grove of live oaks, preserved and cherished for some future man-of-war, because live oak is the most lasting wood for bridges; or, if the commissioners choose, because live oak is worth one dollar per cubic foot in the New York market.
As Judge Burke said, in Zylstra’s case, 2 Bay, 287 — “This is a pretension so extravagant, that it seems to me to be paying a sorry compliment to law and common sense to dwell upon arguments to the contrary.” We may, it is true, be in no danger of seeing another Jew’s teeth extracted, in order to extort from him his secret horde, for public purposes, without compensation. But it is very possible that we may see a Christian freeholder driven to the knife, in defence of the venerable oaks that shade his paternal burying ground. In Eaves’ case, they leaped over fences, to come at his timber. In Dawson’s, they would pass good oak to come at pine. Once establish their claim to such a selection, and what can stop them but the knife ?
I may be here permitted to add, although it is rather reverting to the question first disposed of, that any one a little acquainted with English domestic history, must have perceived, that it was the encroachments upon private property and personal rights, that brought about the recognition of common-law principles, in the fifty odd confirmations of “magna char-ta;” and that the crying grievances were those which are guarded against in the 29th chapter, called “the corner stone of English liberties.*’ And any one acquainted with the rationale of the American revolution, must understand that it consisted in the self same element. Taxation, without representation, in its plain sense, is taking private property without consent or compensation ; “contra legem terree,” i. e. against the .course and process of common law ; which required that the parties taxed should be assessed equally; and by their own representatives duly appointed, and constitutionally assembled together.
*121 In the former instance, King John usurped the power to levy money, without the representatives of the nation. And, in the latter instance, the King and Parliament would have done the same forbidden act in this country,'without American representation. And the same usurpation, in principle, led to the same confirmation of individual rights ; to which the descendants of the “Barons bold,” improving upon the former model, added national independence. “Esto perpetua” is our prayer, for both the one and the other. Let it be equally our practice.
But I would ask, — are we to derive- no benefit from the experience of past generations, upon this subject ? Is not only every nation, but every age, to weed the same field anew ; and sweat the bloody sweat for private rights? The power is in one great department of our government; and perhaps a safe one, in their hands. • But is there no stopping place ? If the legislature can transfer such authority to any other tribunal, they may to the Governor or any other agent. And would we be then safe, in confiding .that the day may not recur, when it may be again necessary to write, sword in hand,- the emphatic words, “Nullus liber homo ,” &c. &c. di&seisieturp de libero tenetnento suio.”
It not only may, but will recur, unless their plain version in our constitution, “Private property shall not be taken for public use, but upon just compensation,” be held sacred in practice as well as theory. Do these broad English words protect all private property; or are they but terms to amuse the-sanguine, and impose upon the zealous, until exception after exception shall have frittered away the principle? We are even now' told that the general government are already laying fast hold upon despotic power. Let us giye them, at least, an earnest of what may be, by saying to the domestic department, while yet it is unsullied by tyranny,— “Obsta priucipiis.” Use your authority fairly, firmly and discreetly; but give it not to other hands that may abuse it.
Here would I hold,
But there is strictly another legal view, under which it appears to me that Dawson ought to have been acquitted. The commissioners, at least, stretched their power quite beyond the.usual practice. Power is often harmless in the hands of honest men, — especially where all are interested to prevent oppression. But their conduct in this instance had the assuming air of imposition and abuse of authority, in requiring their own choice of timber, when very good was offered, and near at hand. NineT teen men out of twenty would have deemed it an abuse of power. Whgt. was Dawson to do ? If he sued the commissioners merely, his timber *122 was gone; and they would justify or excuse themselves, under the letter of the Act. Was he not then, excusable for resisting? and ought he to have been convicted of any offence ?
Under this view of the case, I take it as granted, that the verdict can be upheld; not so much upon the ground that the commissioners acted with the .view to trespass as little upon the defendant’s property as their duty permitted them ; as upon the prerogative right that they had authority to act, at their own discretion ; and that the defendant cannot but be guilty for obstructing their power by any opposition whatever. And my argument is, that no man can be legally convicted of any offence, for opposing the abuse of official authority, whenever such abuse reaches his person or property. And of course, that the proper legal inquiry for the jury, ought to have been, whether the commissioners had abused their authority; and if so,'then the defendant could not be found guilty for opposing them.
Admit that the commissioners have the general power to take timber j yet still, there must be some limitation to their selecting trees wherever they wish. And if there is no express legal restriction, then in that case, the only restiiction upon the licentious use of their power, lies in the course pursued by the defendant.
I hold it a fundamental principle of law, that if an officer commits an abuse of .his authority, or an apparent abuse, and thereby trespasses upon the rights of a citizen, he may defend his rights, and cannot be convicted of any legal offence; notwithstanding the general power of the officer.
In every such case, the individual opposing the officer, takes the consequences upon himself. If he cannot shew the abuse by the officer, he is himself the trespasser, and must be convicted. But if the abuse be apparent, criminal .offence cannot be predicated of the defence of the rights of propel ty or'person, against such abuse. The defendant may not be, strictly speaking, justifiable; but he is excusable, and cannot be found .guilty of ciime. The question of abuse in all such cases, is, as a condition precedent, and must be disposed of before any legal verdict can follow.
If a sheriff charged with hanging a convict, were to half strangle him .on the way to the gallows, or to drag him there by the heels, the felon might resist ap<,l repel the aggiession, and yet commit no legal offence. In a word, every abuse of power is an unlawful perversion. And if the abuse of the power consists in a trespass upon the person or property of a citizen, he may oppose the trespass, and be innocent of crime.
The distinction is between power and authority. Power without right, ^annot constitute legal authority; and atiy abuse of the authority sunders *123 the right and leaves the naked power. The officer who uses such naked power, is bereft of the privilege of his commission; and whenever any man has suffered, or might have suffered, by the abuse, he comes uiidei' the peculiar protection of judge and jury, and is excusable for resisting the wrong offered.
Bailey, for motion.-
Upon this view of the case, for the commissioners, I would say, let them have another opportunity to shew that they practised no abuse of their great powers; and for the defendant, let him have the same, in order to meet the very issue his case makes up,- even if under past adjudications/ he can make no other defence;